JOHN BURKE AND ANNA BURKE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Burke v. Commissioner
Docket Nos. 11102-84; 20850-84; 20851-84; 20852-84; 20853-84; 20919-84; 20921-84; 20922-84; 27915-84; 29264-84; 30713-84; 24915-85.
United States Tax Court
T.C. Memo 1988-545; 1988 Tax Ct. Memo LEXIS 574; 56 T.C.M. (CCH) 742; T.C.M. (RIA) 88545; November 29, 1988. John S. Yohanan, for the petitioners. Thomas M. Rohall, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: In these consolidated cases, respondent determined the following deficiencies and additions to tax against petitioners: Petitioner
Docket No.
Year
Deficiency
Burke
11102-84
1980
$ 2,794.00
Nelson
20850-84
1981
1,667.08
Gorsuch
20851-84
1980
1,752.00
1981
1,516.00
Strause
20852-84
1980
3,702.00
Dito
20853-84
1980
4,027.00
1981
3,777.00
McLeod
20919-84
1980
341.00
1981
1,087.00
Hanley
20921-84
1980
1,433.00
1981
2,166.00
Sardo
20922-84
1980
5,197.00
1981
4,754.00
Popenoe
27915-84
1980
673.00
1981
1,165.00
Borba
29264-84
1981
1,432.54
Hickman
30713-84
1981
2,020.00
Carter
24915-85
1981
4,495.00
*575 Petitioner
6653(a)
6653(a)(1)
6653(a)(2)
Burke
$ 139.70
-0- -0-
Nelson
-0- 83.35
*
Gorsuch
88.00
-0- -0-
-0- 76.00
*
Strause
185.00
-0- -0-
Dito
201.00
-0- -0-
-0- 189.00
*
McLeod
17.00
-0- -0-
-0- 54.00
*
Hanley
72.00
-0- -0-
-0- 108.00
*
Sardo
-0- 260.00
-0-
-0- 238.00
*
Popenoe
34.00
-0- -0-
-0- 58.00
*
Borba
-0- 71.63
*
Hickman
-0- 101.00
*
Carter
-0- 225.00
*
The issues for decision are (1) whether respondent correctly determined the amount of tip income received by petitioners during 1980 and 1981; and (2) whether petitioners are liable for additions to tax under sections 6653(a), 6653(a)(1) and (2), as applicable, for negligence or intentional disregard of rules and regulations. [2]
FINDINGS OF FACT Some of the facts have been stipulated *576 and are so found. The stipulation of facts, supplemental stipulation of facts and attached exhibits thereto are incorporated herein by this reference. At the time they filed their petitions in this matter, all petitioners resided in California. Petitioners timely filed Federal income tax returns for the years in issue. All of the female petitioners [3] were food service waitresses at The Nut Tree Restaurant of California (the Nut Tree or the restaurant) during the taxable years in issue. [4] The Nut Tree is located along Interstate 80, between San Francisco and Sacramento, California, near the Lake Tahoe resort area. The Nut Tree's clientele is comprised primarily of families, tourists and travelers. The Nut Tree, which opened for business in 1921, is an established institution that has contributed to the development of distinctive California cuisine and, in addition, pioneered *577 the dried fruit pack industry. The restaurant complex contains an airport, a gift shop, a toy shop and a Disneyland style train. The restaurant has its own post office, a bake shop, a "sandwich garden" and a "beer bar." The Nut Tree's banquet facilities are used weekly. During 1980 and 1981, the Nut Tree's price for breakfast ranged from a low of $ 2.25 to a high of $ 5.75. Lunch prices during those same years ranged between $ 3.95 and $ 8.50. Dinner prices ranged from a low of $ 11.50 to a high of $ 17.50. [5] A good selection of California wines and imported beers was also available and the menus were changed at least four times a year. *578 During the years in issue, the restaurant was open from 7:00 a.m. to 9:00 p.m. every day except for Christmas Day. Generally the busy season at the Nut Tree lasts through the summer months and into October. The Nut Tree contains 2 dining rooms which are divided by an aviary with live flowers, trees and birds. One dining room is known as the Mexican room and is also used for banquets. Petitioners were randomly assigned to work a banquet or catered party. Each server is generally responsible for one station containing between 16 to 19 seats. Customers are usually seated randomly in the restaurant. Although there are certain areas of the restaurant which customers seem to prefer, all stations are rotated among the servers. Depending on whether the restaurant is busier or less busy than expected, the restaurant management adjusts the number of servers accordingly. When servers report to work their time is generally spent waiting on customers. However, as shown by the time cards maintained by the Nut Tree, servers also work "classroom hours," or "trainee on the floor hours." During 1980 and some part of 1981, tips from charges were recorded by the cashier on a sheet which *579 included the amount of the tip and the identity of the server. The tip money was placed in an envelope bearing the server's number and the guest check number on the outside and put in the server's locker. In 1981, the management began taking the server's envelope containing the tips to the security office where they were logged in again. The server was required to sign for her charge tips. At the Nut Tree the employee is responsible for reporting his or her tips to the employer. [6] All petitioners, except petitioners Gorsuch, Hanley and Sardo, stipulated for purposes of this case that they did not keep any records (other than the tip slips that the employees turned in to the restaurant) of their tip income received during 1980 and 1981. Petitioners Gorsuch and Hanley kept diaries wherein they recorded some of their tip income. All servers perform "relief *580 work" at the restaurant. The relief server receives $ 1.00 for a 10-minute break and $ 2.25 for a half-hour lunch break from the server who is relieved and generally does not receive a tip unless she has fully waited on a table. The servers do not share their tips with busboys, hostesses or cooks, except during a catered function. During the years in issue Nut Tree paid petitioners the hourly minimum wage. As pertinent here, each petitioner worked and was paid for the following number of regular hours at the Nut Tree: Petitioner
1980
1981
Burke
1,109.00
N/A Nelson
N/A 1,263.00
Gorsuch
1,008.50
783.75
Dito
1,808.25
1,936.50
McLeod
285.25
840.50
Hanley
935.00
1,325.50
Sardo
1,910.50
1,919.75
Popenoe
550.00
1,021.50
Borba
N/A 877.00
Hickman
N/A 1,053.75
Carter
N/A 1,456.00
Strause
1,496.00
N/A Respondent selected the Nut Tree restaurant for a tip income study in 1982. At some time prior to 1982, Lawrence Lindelof (the revenue agent) examined the Nut Tree's employee wage and tip reports to the State of California for one annual quarter and the Nut Tree's sales records for the same quarter. The revenue agent compared *581 the two documents and found that only four percent of the total sales for the quarter were reported as tips. This reported figure was considered low and the tip income study at the restaurant was authorized and was commenced in 1982. Respondent determined hourly tip rates which were then multiplied by the number of hours each petitioner worked to compute each petitioner's tip income. This number was compared to the tip income figures reported by petitioners on their tax returns, and was greater than the reported tip income for each petitioner. Respondent issued notices of deficiency based on the difference between these numbers. The results of this process as modified [7] are as follows: Respondent's
Amount of
Determination of
Tips Reported
Unreported
Petitioner
Year
Tip Income
on Return
Tips
Burke
1980
$ 8,173.33
$ 1,409.00
$ 6,764.33
Nelson
1981
10,419.75
3,478.00
6,941.75
Gorsuch
1980
7,432.65
1,118.00
6,314.65
1981
6,465.94
614.60
5,851.34
Strause
1980
11,025.52
2,330.00
8,695.52
Dito
1980
13,326.80
4,385.00
8,941.80
1981
15,976.13
4,594.00
11,382.13
McLeod
1980
2,102.29
479.00
1,623.29
1981
6,934.13
1,290.00
5,644.13
Hanley
1980
6,890.95
2,377.25
4,513.70
1981
10,935.38
2,257.70
8,677.68
Sardo
1980
14,080.39
3,374.00
10,706.39
1981
15,837.94
3,264.00
12,573.94
Popenoe
1980
4,053.50
1,065.27
2,988.23
1981
8,427.38
2,727.00
5,700.38
Borba
1981
7,235.25
1,348.00
5,887.25
Hickman
1981
8,693.44
1,864.00
6,829.44
Carter
1981
12,012.00
1,419.00
10,593.00
*582 Respondent began his computation [8] of the hourly tip rates with the total (gross) restaurant sales which were $ 4,106,409 and $ 4,734,535 during 1980 and 1981, respectively. [9] Respondent then reduced gross sales by 10 percent to account for non-tippers (the stiff rate) and other variables. After selecting two stratified random sample periods for the tax years 1980 and 1981 (21 days for 1980 and 28 days for 1981), respondent obtained the charge slips available from the Nut Tree for the sample days. [10] No charge slips were available for the first quarter of 1980. *583 Only charge slips which showed a tip were included in the formula because the charge slips without tips could indicate either that a tip was left in cash or that no tip was left at all. In reviewing the charge slips, the revenue agent also excluded from the formula charge slips which bore notations such as "tip left on table" and "tip included." The revenue agent then added up the charged tips and divided the sum into the total charge sales to arrive at the tip percentage. For 1980 respondent arrived at a tip percentage of 14 percent, rounded down, and for 1981 the respondent determined that the tip percentage was 13 percent, rounded down. After multiplying the appropriate tip percentage by net sales (gross sales less 10 percent stiff rate), the revenue agent determined that the gross tips for 1980 and 1981 were $ 517,408 and $ 553,942, respectively. Gross tips was then divided by the total number of hours worked by the servers to arrive at a tip per hour rate. The total hours used by respondent for 1980 and 1981 were 56,950 and 65,721, respectively. The total hours used in arriving at the tip per hour rate included only regular hours and "trainee on the floor" hours, and *584 not classroom hours. The tip per hour rate, which was manually determined for 1980 was $ 9.08 and for 1981 the rate was $ 8.42. To determine total tip income, the revenue agent then multiplied the tip per hour rate arrived at by the total hours worked by each individual server, excluding all trainee hours. From the total tip income the revenue agent subtracted the tip income reported on the return to arrive at unreported tip income. After the revenue agent completed the project, the source data and summaries were transported to San Francisco. Most of the initial documents were subsequently misplaced and could not be located for trial. Using copies of the original data plus additional charge slips for the last two days of 1980, the revenue agent used a computer program which calculated the sampling error to arrive at an adjusted tip rate. [11] Using the computer program, the adjusted tip rate for 1980 and 1981 was determined to be 13.37 and 12.73, respectively. [12]
*585 OPINION In these consolidated cases, we are required to determine whether respondent's use of formulas, as described by the findings of fact, reasonably reflects the amount of tips received by petitioners as food servers at the Nut Tree restaurant. As a general rule, respondent's determinations are presumed correct and the burden is on petitioners to show otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Tip income is includable in gross income under section 61(a). Meneguzzo v. Commissioner,43 T.C. 824 (1965). Where taxpayers fail to keep any records or fail to keep accurate records of their income, respondent is authorized to reconstruct the income by any means the Secretary deems reasonable. Sec. 446; Meneguzzo v. Commissioner, supra;Sutherland v. Commissioner,32 T.C. 862 (1959). Taxpayers are required to maintain sufficient records to establish the exact amount of any tip income received. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.; Anson v. Commissioner,328 F.2d 703, 705 (10th Cir. 1964), affg. a Memorandum Opinion of this Court. The taxpayer may, of course, point out *586 areas or specific instances in which the method used by the respondent fails to reflect his true income. Miller v. Commissioner,237 F.2d 830 (5th Cir. 1956). Respondent's income reconstruction need not be exact, but need only be substantially correct. Anson v. Commissioner, supra.
The formula utilized by respondent is very similar to, and was derived from the formula accepted by this Court in McQuatters v. Commissioner,T.C. Memo. 1973-240. In an attempt to meet their burden of proof, petitioners have attacked the formula employed by respondent on several grounds. Petitioners' first contention is that respondent's formula did not account for the fact that the Nut Tree possesses certain rooms which are less desirable to work in than others. We find that the case upon which petitioners rely, Dunn v. Commissioner,T.C. Memo. 1975-191, is distinguishable from the situation here. Dunn involved a restaurant with several distinct rooms including a dining room and several lounges and where the taxpayer worked only in one of the lounges. In this case all petitioners worked in the main dining area, except on occasions *587 where they worked in the Mexican room for banquets or the stations used when the restaurant was very busy. The testimony also showed that the assignment of the servers to the various stations was on a purely random basis. Petitioners next argue that respondent did not make any allowances for the type of clientele frequenting the Nut Tree -- travelers, tourists and families. However, no reliable evidence was introduced to indicate that the customers who frequented the Nut Tree tipped at a rate lower than that which was determined by respondent and, accordingly, we address this point no further. Petitioners also challenged the manner in which respondent determined the tip percentages which were computed by a reference to charge sales tips. Two assumptions follow from the use of charge sales with tips as a basis for computing the tip percentages. These are (1) that customers who charge meals but do not put a tip on the charge slip leave tips in cash equal to the amount which they would have if they had charged the tip as well as the meal, and (2) that cash customers leave tips equal to those charge customers. Petitioners object to both assumptions arguing that customers who charge *588 the tip generally leave greater tips than do customers who leave cash tips. Petitioners claim that cash tips are generally less than charge tips in an amount at least 1 percent to 1/2 percent. In this case, respondent did not reduce the tip rate to account for any difference in charge versus cash tips because there was little evidence that there was, in fact, a difference. The study to which respondent's expert referred shows that on average, cash tips are about 1 percent less than charge tips. It is therefore up to petitioners to show that cash tips were actually less. The only evidence introduced by petitioners was their own testimony. Without more specific evidence, such testimony is entitled to little weight. In short, given the fact that respondent is obligated to construct income reasonably and given the lack of any objective evidence of unreasonableness, we must sustain respondent in this regard. We have in the past endorsed the use of charge sales as a basis for computing overall tip percentage. [13]
Next, petitioners argue that respondent's determination of tip income should be reduced *589 because it failed to differentiate between food-to-go, catering, and banquets. With respect to the tipping rates at banquets and catered functions, petitioners maintain that the tipping rates vary from 0 to $ 5 per hour. The evidence, however, demonstrates that the tips varied according to the amount of the bill, the same as tips vary for regular restaurant service. Indeed, the time cards for one petitioner indicate that tips for a banquet could be as high as $ 10 per hour. Petitioners next argue, relying on McInnis v. Commissioner,T.C. Memo. 1981-25, that the hourly tip rate generated by the McQuatters formula fails to accommodate the fact that tips fluctuate throughout the day because sales do not remain constant through the day. The McQuatters formula produces two figures which represent the averages of the total hours and total sales of a restaurant. A first average, the tip percentage, is computed by dividing total tips by total charge sales which show a tip. The second average is the tip per hour rate which is arrived at by dividing the gross tips by the total hours worked. As indicated above these figures share the advantages and disadvantages *590 of all averages. Petitioners also point out that a server may receive more money on a busy day or during the "rush period" for lunch or dinner than at other times. However, the restaurant had more servers on the floor during the rush hours than before or after, and thus more server hours during rush periods. Petitioners' argument amounts to nothing more than a criticism that the averages returned by respondent are not completely accurate for any given day. Petitioners also request that the Court rule that there are no deficiencies due for taxable year 1980. Petitioners assert that the record does not support respondent's deficiency determination for 1980. The revenue agent who conducted the tip income project testified that he did not personally write down the number of hours that each petitioner worked. However, the same data that was used in the analysis was secured a second time from the restaurant. Respondent's statistical expert testified that in his opinion the 1980 sampling was accurate and statistically correct, although he pointed out that the sampling error was higher due to the low volume of charge slips and other factors. Petitioners next contend that a 20-percent *591 stiff rate should be used instead of the 10-percent rate which was used in the formula. However, petitioners failed to introduce any evidence that a 10-percent stiff rate is not accurate for the Nut Tree. Petitioners did introduce coupons from gamblers who frequent the gambling resorts in Nevada and religious coupons which they often receive in lieu of tips. Petitioners also introduced a publication which indicated that overall a 20-percent stiff rate would be an appropriate average. However, the study represented an average for the entire country. Respondent produced specific testimony that a 10-percent stiff rate is appropriate and accurate for the San Francisco and Sacramento areas. Respondent's witness testified that in her numerous tip income studies no evidence was presented which showed that a stiff rate would be higher than 10 percent. The testimony also indicated that the 10-percent stiff rate included other variables which may affect the tip rate. The potential variables which petitioners have mentioned on brief have been for the most part taken into account in the stiff rate. Therefore, in the absence of credible evidence to the contrary, we cannot say that respondent's *592 choice of a 10-percent stiff rate is unreasonable. Nonetheless, while we believe respondent's formula to be substantially correct, there are a few minor adjustments that need to be made. The first refinement concerns the tip percentage which ought to be used. As stated previously, respondent in his initial determination in the tip income project used 14 percent for 1980 and 13 percent for 1981. These percentages were rounded down. Later with the aid of a computer and respondent's statistical expert, respondent determined a tip percentage of 13.37 percent and 12.73 percent. We conclude that these are more accurate percentages for 1980 and 1981, respectively. The second refinement, as pointed out in respondent's trial memorandum, concerns the inclusion of sales tax as part of the total sales shown on the charge slips. The adjusted tip percentage was calculated by including sales tax. [14] Furthermore, respondent, in arriving at a tip per hour rate, used 56,950 total hours for 1980 due to a transposition error when he should have used 67,048 total hours. Thus, the correct computation would not include sales tax in the figure for total sales and would use 67,048 hours. *593 A final adjustment needs to be made to the amount of total sales. Respondent listed in total sales those sales resulting from carry-out foods. However, because petitioners did not, as far as we can determine, receive a tip on a carry out sale, the amount of total sales should be reduced by the amount of sales of carry-out foods. The final issue for our determination is whether petitioners are liable for additions to tax for negligence and intentional disregard of rules and regulations. Section 6653(a)(1) provides for the imposition of a 5 percent addition to tax if any part of the underpayment of tax due to negligence was intentional disregard of the revenue laws. Section 6653(a)(2), effective for 1981, imposes a further addition to tax in the form of 50 percent of the interest payable on a portion of the underpayment attributable to negligence. Petitioners have the burden of proving error in respondent's determinations that these additions to tax should not be imposed against them. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Petitioners have failed to introduce any evidence on this issue either at trial or on brief. In addition, petitioners failed *594 to keep records for their tips as required by section 6001. Petitioners appear to have conceded the issue. We conclude that because petitioners failed to carry their burden of proof respondent's determination with respect to the additions to tax will be sustained. Decisions will be entered under Rule 155.
Footnotes
1. The following cases were consolidated for purposes of trial, briefing and opinion: James Andrew Nelson and Marylene Y. Nelson, docket No. 20850-84; Loreta Gorsuch, docket No. 20851-84; Fred C. Strause and Carol M. Strause, docket No. 20852-84; Ada Dito, docket No. 20853-84; Kim L. McLeod, docket No. 20919-84; Milton J. Hanley and Takako Hanley, docket No. 20921-84; Elizabeth Sardo, docket No. 20922-84; Jessie P. Popenoe, docket No. 27915-84; Carlos A. Borba and Sonia D. Borba, docket No. 29264-84; Peter T. Hickman III and Cheryl L. Hickman, docket No. 30713-84; Fran R. Carter and Dorothy Carter, docket No. 24915-85.↩
*. denotes interest of 50 percent to be determined on the underlying underpayment↩
2. All section references are to the Internal Revenue Code of 1954, in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. All references to petitioners will be to the female petitioners. ↩
4. As of 1980 and 1981, most of petitioners had been in the employ of the Nut Tree for many years. For example, petitioners Dito, Sardo and Carter had been employed at the restaurant since 1941, 1947 and 1957, respectively. ↩
5. The following table shows the percentage of time worked for each petitioner during the breakfast, lunch and dinner shifts during 1980 and 1981: 1980
Sunday
Petitioner
Breakfast
Lunch
Dinner
Brunch
Dinner
Burke
12%
54%
11%
8%
16%
Nelson
N/A N/A N/A N/A N/A Gorsuch
20%
48%
0 17%
15%
Strause
20%
56%
1%
12%
11%
Dito
51%
49%
0 0 0 McLeod
7%
17%
56%
5%
16%
Hanley
12%
58%
5%
12%
13%
Sardo
56%
44%
0 5%
5%
Popenoe
2%
16%
65%
1%
16%
Borba
N/A N/A N/A N/A N/A Hickman
N/A N/A N/A N/A N/A Carter
N/A N/A N/A N/A N/A 1981
Sunday
Petitioner
Breakfast
Lunch
Dinner
Brunch
Dinner
Burke
N/A N/A N/A N/A N/A Nelson
15%
53%
8%
6%
18%
Gorsuch
20%
35%
0 28%
17%
Strause
N/A N/A N/A N/A N/A Dito
53%
47%
0 0 0 McLeod
0 8%
71%
0 21%
Hanley
19%
53%
1%
14%
13%
Sardo
63%
37%
0 0 0 Popenoe
1%
24%
52%
0 23%
Borba
8%
48%
14%
10%
20%
Hickman
7%
54%
13%
9%
17%
Carter
38%
55%
0 0 8%
In a few of these cases the percentages of hours worked at each shift add up to a total in excess of 100 percent. However, petitioners failed to explain this anomaly.↩
6. During 1980 and the first quarter of 1981 the servers reported tips on a signed and dated tip slip. The Nut Tree totalled the tip slips and reported the total on each server's W-2 Form at the end of the year. The tip reporting procedure changed during 1981 to require that the tips be reported on the server's time card.↩
7. This chart reflects the new adjusted tip rate determined by the computer program analysis completed prior to trial in this case.↩
8. At the time the tip income project was conducted, there was no computer program to analyze the charge data and calculate the sampling error; thus the initial tip income project was largely computed manually. ↩
9. Ms. Annie Casper, Controller of the Nut Tree, testified that gross sales included the following: banquet sales ($ 82,040 and $ 229,330 in 1980 and 1981, respectively); catered sales ($ 66,321 and $ 24,521 in 1980 and 1981, respectively); and cold food-to-go sales ($ 56,797 and $ 75,615 in 1980 and 1981, respectively). ↩
10. According to respondent, a stratified random sample is a more accurate sampling technique than a straight random sample.↩
11. Because the data analyzed for 1980 was less than that for 1981, the sampling error would be larger than for 1981. The adjusted tip rate takes into account the sampling errors for both years. ↩
12. In conducting the project, the revenue agent was aware that the number of charge slips for 1980 was relatively low in comparison with the charge slips for 1981. Accordingly, a decision was made to use 1981 as a control year and if the percentage arrived at for 1980 was exorbitantly high or low, 1980 would not have been used in the study. The percentage arrived at for 1980 was only one percentage point higher than 1981 and therefore was used.↩
13. See, e.g., Chippi v. Commissioner,T.C. Memo. 1971- 236↩.
14. Including sales tax in total sales works to petitioners' benefit since it tends to reduce the tip percentage.↩